*Nellie JUDY, Cleo Y. Johnson, Eddie Arthur and Ernest Yazzie*
Plaintiffs

*vs.*

*Bobby WHITE, as Controller of the Navajo Nation; and Jane Does I through V, in their capacity as individual authorized to sign or process Navajo Nation checks or pay accounts*
Defendants

In the District Court of the Navajo Nation

Judicial District of Chinle, Navajo Nation (Arizona)

No. CH-CV-53-01

August 21, 2002

## OPINION

The court has separately entered its findings of fact, conclusions of law and judgment in this case. Given the importance of the case, and public interest in it, the court feels that it should enter a separate opinion to supplement that document and further explain the basis for its ruling. This opinion will address (1) the issue before the court and the evidence that was considered, (2) the factual history of the case, (3) the meaning of the Title 2 Amendments in relation to salary increases, and (4) applicable principles of Navajo common law.

### I

While this case went to trial, it is actually a fairly simple case involving only statutory construction, or the principles to be used when reading statutes. Attorney Albert Hale testified, as did Nellie Judy and Cleo Y. Johnson. Bobby White, the defendant and Controller of the Navajo Nation, also testified.

The real question in this case is whether, when you read the actual provisions of the 1989 Title 2 Amendments along with later enactments of the Navajo Nation Council, those enactments are valid. A court must do several things when it reads statutes. First, it must interpret them to accomplish their purposes. *Navajo Nation v. MacDonald*, 7 Nav. R. 1, 6 (Nav. Sup. Ct. 1992). Second, a court must read statutes "as a whole" (meaning that you read every part of the statute, from the preamble through the actual enactments) and avoid taking them out of context. *In re Claim of Joe*, 7 Nav. R. 66, 67 (Nav. Sup. Ct. 1993). Third, the court must read all applicable statutes in pari materia (a Latin phrase meaning to read all the statutes together in harmony with each other, insofar as is possible), and read them in light of their contemporary history and the intent of the Navajo Nation Council. *Blaze Const., Inc. v. Crownpoint Inst. of Technology*, 7 Nav. R. 296, 301 (Nav. Sup. Ct. 1997). Fourth, a court must read the law in such a way as to avoid absurd results. *McCabe v. Walters*, 5 Nav. R. 43, 45 (Nav. Ct. App. 1984); *Foster v. Lee*, 3 Nav. R. 203, 206 (W. R. Dist. Ct. 1982).

In this case, the plaintiffs had Albert Hale, Esq. testify on the meaning of the 1989 Title 2 Amendments. The defendant objects-and correctly so-that although Mr. Hale may know a great deal about them because he wrote them, he can only give his personal opinion of what the law meant. The defendant is correct. While Mr. Hale is an outstanding member of the Navajo Nation bar, and he has intimate knowledge of the Title 2 Amendments because he wrote most of them, that does not qualify as "legislative history." His opinions are not part of the official record of the Title 2 legislation unless they can be found in that record and unless they are adequate evidence of the meaning of legislation found in the record. Any review of legislative history is limited to finding the intent of the Navajo Nation Council in enacting legislation. Accordingly, the court decided to consider Mr. Hale's testimony on the amendments only as a useful orientation and beginning point for reading the actual statutes.

The plaintiffs did a thorough job of assembling the history of the legislation under consideration here. That history, and documents showing the events leading up to, and following the legislation, fill four large ring binders. The court reviewed each document. Despite the thoroughness of the record, however, the court finds that while many of the statements found in the legislative history are supportive of their position, they do not necessarily *support* it. That is, while the sponsors of the Title 2 resolution may have rejected a call to drop a chapter referendum provision for Council delegate pay raises, and a sponsor may have made a comment on how useful it would be to have checks and balances on delegate pay raises, those are only isolated instances of personal opinion. A more conservative approach to statutory construction, and one approved by several federal judges, is to start with a reading of the applicable statutes on their face. Do they make sense? Can you understand what they mean within their own context, reading them together? If you can, then one need not bother with legislative history. It is good to review it anyway, but the solution to this case lies within the Navajo Nation Council's enactments themselves.

## II

The chronological story of this case is fairly simple. On December 15, 1989, the Navajo Nation Council adopted sweeping changes in Navajo Nation government. It is apparent, from reading the preamble to Resolution No. CD-68-69, that the Navajo Nation Council intended to deal with power imbalances, too much concentrated power in the hands of the Council, and other shortcomings in Navajo Nation government, by distributing power and providing for checks and balances in government. Among those checks and balances was the provision in Section 106 of the resolution that provides that Council delegates are to receive an annual salary of $25,000, and no salary increase will be effective unless it is ratified or approved by a two-thirds vote of all Navajo Nation chapters. The Council wisely felt that the government reform process should continue. It provided for a Navajo Nation Commission on Government Development to study long-range and alternative reforms and to make recommendations to the Council. However, there is an uncodified provision in resolution No. 7 of the overall Resolution that certain things "shall not apply" to amendments proposed by the Commission: the establishment of the Legislative Branch of the Navajo Nation (unless changed by a referendum vote); the requirement of 88 Council delegates (unless changed by a referendum vote); the salaries of the President and Vice President (unless changed by a referendum vote); and the salaries of Council delegates (unless approved by two-thirds of all Navajo Nation chapters).

In 1999, the Navajo Nation Council adopted a resolution that would have eliminated the requirement of the ratification of Council delegate pay raises by the approval of two-thirds of the chapters, but only seven of the Navajo Nation's 110 chapters approved the resolution, and it failed.

In April of 2000, the Chief Legislative Counsel found a way to bypass the

plain meaning of the two-thirds ratification requirement-by having the Navajo Nation Commission on Navajo Government Development propose a resolution to permit a pay raise and having the Council approve it-under the uncodified section 7 provision.

The Commission met with the Shonto Chapter on April 28, 2000, and members of the Council approached the Commission to ask that it approve a $10,000 pay raise. The proposal was deferred because that proposal wasn't an action item on the Commission's agenda. However, the Commission met in a "work session" in Window Rock on May 30-31, 2000 to consider not only salary adjustments, but other compensation for Council delegates. The Commission met again on June 12, 2000 and adopted a resolution proposing pay raises for Council delegates and for the President and Vice President. The resolution recited "input from numerous Council delegates, members of the public, and members of the Executive Branch" in support of the resolution. It also recited some prior Commission studies, Public Hearing on Government Reform (1992) and Government Reform Agency Focus Group (1999). The resolution did not show what it did to give public notice so that members of the public would know what was being proposed and have an opportunity to participate in Commission discussions or make comments on the salary proposals. The Commission resolution did not indicate that traditional Navajo values or philosophical views applied to either the pay raise issue or the manner in which the resolution was adopted.

Based upon the Commission's recommendation resolution, the Navajo Nation Council adopted Resolution No. CJY-52-00 on July 20, 2000. It increased Council delegate salaries to $35,000 per annum, the salary of the President to $65,000 per year, and the salary of the Vice President to $55,000. President Kelsay A. Begaye vetoed the resolution, giving a detailed analysis of his reasons for doing so, but on July 31, 2000, the Navajo Nation Council adopted Resolution No. CJY-63-00, overriding the veto.

One of the effects of the pay raise resolution is that it increases amounts paid into Council delegate deferred compensation accounts. Those are accounts, based upon delegate pay scales, to provide a fund for Council delegates when they retire or are not returned to office by the voters. In addition to the pay raise, on April 18, 2000, the Navajo Nation Council enacted Resolution No. CAP-23-00 to make Council delegates "common law employees" of the Navajo Nation. Section 109 of the Title Two Amendments provides that Council delegates are self-employed. Normally, a self-employed individual must make quarterly estimates of income to the Internal Revenue Service and file his or her own tax returns (including self-employment Social Security tax). Section 109 provided that the Controller could make deductions from Council delegate salaries for quarterly reports, estimated tax payments, and annual returns. The April 18, 2000 resolution followed an anonymous Council delegate request for an IRS determination on

his tax status, and the resolution required mandatory tax withholding. The problem was that the resolution appropriated an additional $178,695 from recurring funds "to supplement additional cost [sic] associated for the benefit improvements." The defendant's proposed findings of fact indicated that those costs are a Navajo Nation contribution of 6.2% of each Council delegate's salary for social security benefits, and 1.45% of that salary for Medicare payments (something not mentioned in the "common law employee" resolution). Instead of being only a mandatory deduction from delegate pay, there is an additional Navajo Nation contribution to tax payments, and that in turn increases the amount of take-home pay to each Council delegate.

## III

Were those Council actions valid? We begin with the provision of the Navajo Nation Sovereign Immunity Act, at 1 NNC Sec. 554(G) (1995), that this court has jurisdiction to award declaratory, injunctive, and mandamus relief where a defendant does not perform his responsibilities under Navajo Nation law. What are those responsibilities? They are first grounded in the concept that monies spent by the Navajo Nation Council are actually the monies of the Navajo People. *Halona v. MacDonald,* 1 Nav. R. 189, 211 (Nav. Ct. App. 1978). Where the property of the Navajo People is involved (general funds for salaries in this case), the court has a duty to assume jurisdiction as a guardian of that property "to determine whether it is being managed in the best interests of the Navajo People." *Tome v. Navajo Nation,* 4 Nav. R. 159, 161 (D. Window Rock 1983), *aff'd on other grounds,* 5 Nav. R. 5 (Nav. Ct. App. 1984).

The court was concerned about the standing of the plaintiffs to bring this action. First, the classic decision in the case of *Halona v. MacDonald, supra* at 197-199, makes it clear that ordinary Navajos, as "constituents," have the authority to challenge illegal expenditures by the Council. That case, which involved the payment of attorney fees to F. Lee Bailey for defending Chairman Peter MacDonald, made it clear that "constituents" can challenge appropriations as being illegal because they have a personal stake in the matter, they have legal interests that are adverse to defendants such as the one here, their interests are above "the policy decision represented by the expenditure," and illegal expenditures raise questions of Navajo tradition and law. While the defendant obliquely raised the question of standing in a brief supporting a motion to dismiss (citing an election case that is not on point and not addressing *Halona),* he did not directly raise the issue in his motion to dismiss and thereby waived it.

How does this court decide whether the expenditures in this case are "in the best interests of the Navajo People"? The first point is that the 1989 Title Two Amendments, with limitations on pay raises and upon Title 2 amendments based upon Commission on Navajo Government Development recommendations, are a "fundamental and organic" law of the Navajo Nation that prevails over conflicting laws. *Bennett v. Navajo Board of Election Supervisors,*

6 Nav. R. 319, 323 (Nav. Sup. Ct. 1990). What does Title Two say? First, that the Navajo Nation Council clearly cannot grant a pay raise to its members without a two-thirds ratification vote of the chapters approving one. 2 NNC Sec. 106(A) (1995). Second, that neither the President nor the Vice President can have their salaries "adjusted" without a referendum vote in favor. 2 NNC Sec. 1008 (1995). The only exception to those requirements would be if the Council could enact pay raises upon the recommendation of the Commission on Navajo Government Development.

The problem with that is that resolution 7 of the Title 2 Amendments clearly provides that Council delegate and President and Vice President pay raises are not among the things the Commission can recommend. In fact, resolution 7 specifically prohibits the Commission from making a recommendation on such pay raises.

In addition, even if the Commission had the authority to make the recommendations it did, they had to be made in the right way. The Commission was established to, among other things, help "ensure an accountable and responsible government." 2 NNC Sec. 970 (1995). The Commission has the power to "review, evaluate and recommend laws ... to develop a comprehensive system of government for the Navajo People." 2 NNC Sec. 973(B)(3) (1995). The problem is that the salary increase recommendation contradicted not only the Commission's duties to "ensure an accountable and responsible government" and to recommend laws for a comprehensive system of government, but the specific statutory prohibition that the Commission could not recommend the pay increases.

There is something else. The Commission's statute requires it to "encourage the public, private and public organizations, chapters, traditional Navajo leaders, including Native ceremonial practitioners (medicinemen), to actively participate in carrying out the purposes of the Commission and to conduct public hearings." 2 NNC Sec. 973(B)(5) (1995). The Commission held a "work session" in Window Rock on May 30-31, 2000 with Council delegates and others, and it adopted its resolution recommending the pay raises on June 12,2000. There is no evidence that the Commission gave public notice of those meetings or that it in any way got the word out to permit public participation and commentary on the issues. The procedure was flawed. Thus, the resolution adopted by the Council violated the Title 2 Amendments, and the Commission on Navajo Government Development did not follow its own laws.

IV

Navajo common law is relevant to this case, because the Commission's statute requires it to "give due consideration to traditional values and philosophical views of the Navajo People" in making its decisions. 2 NNC Sec. 973(B)(5) (1995). That means Navajo common law.

The testimony of Nellie Judy and Cleo Y. Johnson was particularly helpful in that regard. Nellie Judy is a medicine woman who has the authority to do some of the bedrock traditional Navajo ceremonies. Both plaintiffs had the courage to walk over 100 miles from their home in Pinon to Window Rock to voice their opposition to the pay raise for Council delegates. What they told the court about Navajo common law makes a great deal of sense in English. Rephrased by the court, the Commission violated Navajo common law because while it was required to be open, transparent, inclusive, and to actively consider public opinion in making its decision, it did not do so. Navajo common law requires public notice, talking things out, doing things in the open (*anáhaazláago*) and avoiding "going about in darkness" (being secretive). Violations of those principles violate fundamental Navajo principles of *Sa 'ah naaghai bik'é hózhǫ́*. They were violated by the Council and the Commission in this case.

V

Before concluding, the court must comment upon the contributions of counsel in this case. Donovan D. Brown, Sr., to his credit, came into this case in its late stage, and he took it to trial on fairly short notice. He is to be commended for that. Randolph H. Barnhouse, Leonard Tsosie, and Genevieve K. Chato took on this case pro bono publico-for the public good. Legal practitioners know that reform, public interest, and civil rights litigation seldom pay very much (even where, as here, attorney fees are awarded), and counsel are to be commended for taking on the cause of elderly grassroots Navajos in challenging the actions of their own government.

One of the sad commentaries on this case is that it came to be on the advice of counsel. Given the analysis above, and the plain meaning of the legislation involved, it can fairly be said that the advice that Council delegate salaries could be increased without chapter approval using the Navajo Nation Commission on Navajo Government Development was incompetent advice. The President recognized that when he vetoed the pay raise resolution, and unfortunately, it took a test case to confirm his judgment. The positive commentary on this case is that the right of access to the courts for ordinary Navajos give them an opportunity to challenge the misapplication of Navajo Nation resources. While it may well be that there is merit to the idea of giving Council delegates pay raises, the ones in this case were not supported by established law and procedure set by the Council itself.